IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JANNY HARVEY, | ) | No. 04-613-HU |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | FINDINGS AND RECOMMENDATION |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner, Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Tim Wilborn
Wilborn & Associates
2020-C S.W. Eighth Avenue, PMB #294
West Linn, Oregon 97068
        Attorney for plaintiff

Karin J. Immergut
United States Attorney
Neil J. Evans
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
Richard M. Rodriguez
Special Assistant United States ATtorney
701 Fifth Avenue, Suite 2900
Seattle, Washington 98104
        Attorneys for defendant

HUBEL, Magistrate Judge:

        Janny Harvey brought this action pursuant to Section 205(g) of

FINDINGS AND RECOMMENDATION Page 1

the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for Supplemental Security Income (SSI) benefits.

## Procedural Background

Ms. Harvey filed an application for SSI benefits on August 7, 2001, alleging disability on the basis of low intellectual functioning, learning disabilities, and psychological disorders. Her application was denied initially and upon reconsideration. On December 12, 2002, a hearing was held before an Administrative Law Judge (ALJ). On February 13, 2003, the ALJ issued his decision finding Ms. Harvey not disabled. The Appeals Council denied Ms. Harvey's request for review, making the ALJ's decision the final decision of the Commissioner.

## Factual Background

Born September 28, 1959, Ms. Harvey was 43 years old at the time of the ALJ's decision. She has a 10th grade education. Although the ALJ found that Ms. Harvey had past relevant work as a server, factory worker, bus person, cashier/cook, and child care helper, the finding is unsubstantiated by the record, which shows no earnings at the substantial gainful activity level.

A job qualifies as past relevant work only if it involved substantial gainful activity. Lewis v. Apfel, 236 F.3d 503, 515 (9th Cir. 2001); 20 C.F.R. §§ 404.1560, 404.1565, 416.960, 416.965. Substantial gainful activity is work done for pay or profit that involves significant mental or physical activities. 20 C.F.R. §§

404.1571-404.1572, 416.971-416.975. Earnings can be a presumptive, but not conclusive, sign of whether a job is substantial gainful activity. <u>Lewis</u>, 236 F.3d at 515. Monthly earnings averaging less than $300 generally show that a claimant has not engaged in substantial gainful activity. 20 C.F.R. §§ 404.1574(b)(3), 416.974(b)(3).

The ALJ found no evidence that Ms. Harvey had engaged in any substantial gainful activity since January 29, 1996, her alleged disability onset date. Ms. Harvey's earnings record prior to 1996 reveals that she never achieved average monthly earnings of $300 or more; her highest annual income was $2,406 in 1989. Tr. 62. Moreover, there is no evidence in the record that Ms. Harvey has ever worked more than five months at any job; this was as a child care worker. Her work as a server comprised a few days; her work as a factory worker, cashier/cook, and bus person comprised one to three months. Tr. 94, 160. Accordingly, the court rejects the Commissioner's summary of the evidence with respect to past relevant work.

### Medical Evidence

On June 24, 1997, Ms. Harvey had a psychiatric evaluation by Elliot Harris, M.D., D.O. After an interview, Dr. Harris concluded that Ms. Harvey had "absolutely no insight into her problems," and that she stated she had never seen a psychotherapist before and "has really no idea as to what she is supposed to do or receive here." Tr. 141. Dr. Harris noted that her affect was flat and her thought process was "slow to dull," but there were no abnormalities

FINDINGS AND RECOMMENDATION Page 3

of thought process or content, except for slowness in her response to questions. Id. She was at that time seeing a therapist on a weekly basis, and Dr. Harris decided not to add medication. Id. His diagnosis was adjustment reaction of adult life with depressive quality and learning disability. He assigned a Global Assessment of Functioning (GAF) of less than 40.[1] Id.

Dr. Harris's opinion was that Ms. Harvey had a "long-standing personality deficit, augmented by her learning disability" and that the prognosis for any change was poor. Tr. 142. He observed, "I don't think she will be able to get any job that will give her a living wage that would be above the barest of minimal." Id.

On September 16, 1997, Dr. Harris noted that Ms. Harvey was having problems with her 16 year old son, who was violent and attacked her, but she had "no insight into how to handle it." Tr. 138. Dr. Harris wrote, "She acts as though her cognition and mental capacity are impaired. Her affect is slightly flat and she laughs and giggles at inappropriate times." Id. Dr. Harris ordered

---

[1] The GAF is used by mental health professionals to assess psychological, social and occupational functioning. A GAF between 31 and 40 indicates major impairment in several areas. A GAF between 41 and 50 indicates serious symptoms or any serious impairment of functioning, including being unable to keep a job. A GAF between 51 and 60 indicates moderate symptoms and moderate difficulty in functioning. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (1994)(DSM-IV) at 32.

FINDINGS AND RECOMMENDATION Page 4

psychological testing because he thought her I.Q. and cognitive status might be impaired. Id. Dr. Harris thought she should apply for SSI, because she had "no ability to make decisions for herself." Id.

On October 14, 1997, Dr. Harris noted that Ms. Harvey's lab results showed her to be "profoundly hypothyroid." Tr. 137. Dr. Harris noted that he had thought Ms. Harvey's dullness was due to organicity, as she was quite concrete, very slow to grasp situations, unaware of what was going on, and responded very slowly. Id.

On November 25, 1997, Ms. Harvey was given a psychological evaluation by Lewis M. Etcoff, Ph.D. Tr. 123-130. Ms. Harvey presented with an extremely flat and blunted affect, and was very lethargic. Tr. 123. She tended to process verbal information extremely slowly, to the point that she "often appeared to have difficulty understanding what was being communicated to her, and was subsequently very slow to respond." Id. Her speech was slow and she appeared confused a great deal of the time. Id. at 123-24. Although she was "very cooperative," she tended to be a poor historian, and at times had difficulty answering questions. Tr. 124.

Ms. Harvey reported that she was currently under treatment for hypoglycemia and severe hypothyroidism, for which she was taking Synthroid. Tr. 124. She denied any significant history of emotional difficulties, stating that she began seeing a therapist at Mojave

FINDINGS AND RECOMMENDATION Page 5

Mental Health in February 1997 because of difficulties with her mother and son, with whom she was living. Tr. 125. She denied taking any psychotropic medications, but admitted that she did sometimes hear voices. Id. Ms. Harvey told Dr. Etcoff that her longest period of employment was about five or six months when she worked at a day care center. Id.

Ms. Harvey described herself as significantly depressed from time to time, which she attributed to loneliness. Id. However, she denied suicidal ideation or previous attempts or any history of physical harm to herself. Id. She also described herself as a nervous person, especially around people she did not know, being shy and having trouble relating to other people. Id.

Dr. Etcoff administered a brief form of the Wechsler Adult Intelligence Scale - Revised (WAIS-R). She obtained a Verbal IQ of 76, falling into the borderline range with respect to language skills. Tr. 126. She exhibited deficits in a number of areas: her general fund of information was less than that of 95% of adults her age; her reasoning skills were measured at the 9th percentile, and she showed low-average attention and concentration abilities. Id.

Her Performance IQ score was 78, also in the borderline range. Id. She had significant difficulty with visual organization and was often unable to differentiate essential from nonessential details, even though she "seemed to give great thought to each picture" on the Picture Completion Subtest. Id. Her visual-spatial abilities fell in the low-average range, at the 16th percentile. On the Digit Symbol Subtest, a measure of visual-motor coordination and clerical

processing speed, she performed in the below-average range and at the 5th percentile. Id. Ms. Harvey's Full Scale IQ was 76, in the borderline range. Tr. 127.

Ms. Harvey was also administered the Wide Range Achievement Test - 3 (WRAT -3). Her reading, spelling and vocabulary were at the high school level. Id. Dr. Etcoff wrote,

> Although Ms. Harvey's performance on academic tests measuring reading, spelling, and vocabulary would seem inconsistent with her borderline intellectual functioning, this is in fact not the case because as long as one can process visual information effectively and has decent phonics skills which Ms. Harvey does, it is not impossible for an individual functioning at this level to acquire basic reading, spelling, and vocabulary skills.

Id. On the Arithmetic Subtest of the WRAT - 3, Ms. Harvey fell into the fifth percentile, at a fifth grade level. Id.

Ms. Harvey was given the Trail Making Test, Parts A and B, a measure of attention and concentration and cognitive flexibility. Her performance was very poor and indicative of mild to moderate attentional impairment. On the Stroop Color-Word Test, her performance on the easiest portion of the test fell below the first percentile. Id. In Dr. Etcoff's opinion, her performance on the Trail Making Test and the Stroop Color-Word Test suggested that her attentional skills were very poor and might have been indicative of "some kind of neurological impairment." Tr. 128.

Ms. Harvey's personality test results showed elevated clinical personality scales (dependent, self-defeating, avoidant and passive/aggressive) and two of the severe personality pathology scales were elevated (borderline and paranoid). However, the Major Depression Scale yielded a T-Score of zero.

FINDINGS AND RECOMMENDATION Page 7

Dr. Etcoff's diagnoses were borderline intellectual functioning, dependent personality disorder, avoidant personality traits, and borderline personality traits; he gave rule-out diagnoses of dysthymic disorder, generalized anxiety disorder, cognitive disturbance due to hypothyroidism and mathematics disorder. He concluded:

> Ms. Harvey presents as a woman who has severe cognitive deficits that may or may not be neurological in origin. ... Ms. Harvey clearly suffers from a limited intellectual capacity. Therefore, her ability to reason effectively and use good judgment is seriously impaired.

Tr. 129. Dr. Etcoff recommended a complete neurological workup to determine whether there was any physical evidence of organicity. Tr. 130. He concluded,

> It strikes me that there is reason to be concerned about Ms. Harvey's well-being in the event that she one day does not have family members to rely on for support. It is my opinion that she will be in need of services of some kind due to the fact that she will not likely be able to hold down a job and function unassisted in the community.

Id.

Dr. Harris saw Ms. Harvey and her caseworker on a monthly basis between July 1997 and March 1998. Tr. 131-140. On December 11, 1997, Dr. Harris noted that Dr. Etcoff's diagnosis was consistent with Dr. Harris's diagnosis of borderline intellectual functioning and probable dysthymia. Dr. Harris wrote, "There is no doubt in my mind that this patient functions at a low intellectual capacity. ... " Tr. 134.

In April 2001, Ms. Harvey began receiving outpatient counseling for anxiety disorder from Colin Wood, M.S.W., at Mid-Columbia Center for Living. Tr. 249-285. Physician's assistant

FINDINGS AND RECOMMENDATION Page 8

Jenny Harris prescribed Celexa for depression and anxiety. Tr. 288-291. Ms. Harvey continued to receive medication for hypothyroidism. Tr. 250.

On June 12, 2001, Ms. Harvey had a vocational assessment from Sandra Gettman at Columbia Gorge Community College. Tr. 160. Ms. Gettman concluded that Ms. Harvey would benefit from an assisted job placement, and found that she could do work that had a sequential, set routine, without having to make decisions and being able to move around; that she would be unable to rely on verbal instruction, so that the job could not be dependent on her oral or written expression; and that she was unable to do work that was time pressured. Tr. 163.

On July 31, 2001, Ms. Harvey was given a psychological assessment by Jana Zeedyk, Ph.D. Tr. 166-171. Dr. Zeedyk thought Ms. Harvey showed occasional latencies in her speech, appeared "perplexed by some questions," and needed a "fair amount of time to formulate an answer once she did understand questions." Tr. 168.

Dr. Zeedyk administered the WAIS-III. Ms. Harvey obtained a Verbal IQ score of 64, a Performance IQ score of 70, and a Full Scale IQ of 64. These scores indicated that she was currently operating in the mildly mentally retarded range for verbal skills (first percentile), the borderline range for performance skills (second percentile) and the mildly mentally retarded range for intellectual functioning overall (first percentile). Tr. 169.

Dr. Zeedyk observed that Ms. Harvey worked consistently until she reached her ability ceiling, so that she concluded that the

testing gave a reasonable estimate of Ms. Harvey's current level of functioning. Id. Ms. Harvey's WAIS -III Index Scores showed verbal comprehension at the mildly mentally retarded level (first percentile); perceptual organization at the borderline level (third percentile); working memory at the mildly mentally retarded level (second percentile) and processing speed at the borderline level (third percentile).

Dr. Zeedyk diagnosed adjustment disorder with depressed mood and mild mental retardation. She assigned Ms. Harvey a Global Assessment of Functioning (GAF) score of 45, noting, "limitations in functioning due to relatively low intellectual functioning." Tr. 171.

On September 27, 2001, Social Security reviewing psychologist Dorothy Anderson, Ph.D. completed a Psychiatric Review Technique form. Tr. 211. Dr. Anderson agreed with Dr. Zeedyk's diagnoses of adjustment disorder with depressed mood and mild mental retardation. Id. Dr. Anderson concluded that Ms. Harvey had moderate limitations in maintaining social functioning and concentration, persistence or pace. Tr. 221.

Dr. Anderson also completed a Residual Functional Capacity Assessment and found that Ms. Harvey had marked limitations in the ability to understand and remember detailed instructions and to carry out detailed instructions. Tr. 225. She found that Ms. Harvey had a moderately limited ability to interact appropriately with the general public. Tr. 226.

On October 24, 2001, Peter LeBray, Ph.D. also a reviewing

FINDINGS AND RECOMMENDATION Page 10

psychologist for Social Security Administration, completed a Psychiatric Review Technique form. Dr. LeBray disagreed with the mild mental retardation diagnosis in favor of borderline IQ. Tr. 230. However, he agreed that Ms. Harvey also had an adjustment disorder with depressed mood. Tr. 232.

Dr. LeBray agreed with Dr. Anderson that Ms. Harvey had moderate difficulty in maintaining social functioning and maintaining concentration, persistence and pace, tr. 239, and agreed that she had marked limitations in the ability to understand, remember and carry out detailed instructions and moderate limitations in the ability to interact appropriately with the general public. He disagreed with Dr. Anderson in finding that she also had moderate limitations in her ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. Tr. 244.

Dr. LeBray disagreed with Dr. Zeedyk's GAF of 45 because Dr. Zeekyk was a nontreating source opining on an issue reserved to the Commissioner, and because he thought it too low given Ms. Harvey's activities of daily living. He assessed her GAF at 55. Tr. 245.

Anderson and LeBray found insufficient evidence by which to determine whether Ms. Harvey had had episodes of decompensation. Tr. 221, 239.

Ms. Harvey continued to receive counseling services from Colin Wood, approximately every two weeks, through August 29, 2002. Tr. 253. On many of these visits, she was observed to be calm, relaxed, not depressed. Tr. 276, 279, 280, 281, although there were also

indications of times when she was feeling anxiety about her son, tr. 268, "anxious and not sleeping well," tr. 275, "crying about little things," tr. 276, or having "difficulty asking questions or confronting authority figures, doctors, etc." Tr. 271. On February 12, 2002, she reported feeling anxiety and nervousness; Mr. Wood wrote, "often pulls on hair, smokes too much, withdraws from people, has panic attacks ... gets tight in chest." Tr. 272. On April 23, 2002, she reported nervousness around people, especially strangers or new situations, stating that she "can't think fast," got "paranoid" and worried that she might say or do the wrong thing." Tr. 267.

On April 29, 2002, Mr. Wood wrote a mental health assessment update. Tr. 249. Mr. Wood wrote that Ms. Harvey was considerate of others, very methodical, and working hard to manage her finances and living situation, but that she became uncomfortable with people, got nervous easily, and had mild mental retardation. Tr. 250. He also recorded that Ms. Harvey had community support, including several friends and a church community. Id.

In Mr. Wood's opinion, Ms. Harvey had a fairly short attention span and a somewhat limited general fund of knowledge. Tr. 251. He noted that she had difficulty with her thought processing and understanding and became anxious when she was around other people. Id.

On May 7, 2002, Mr. Wood wrote that Ms. Harvey was "very frightened and anxious" about seeing a dentist. Tr. 265. On June 3, 2002, Mr. Wood wrote that Ms. Harvey "came to session crying,

tearful throughout session, appeared sad, anxious and depressed."
Tr. 262. She reported that her anxiety was up, and that she was not
sleeping well, smoking more and pulling at hair. Id.

    On June 10, 2002, she was started on Celexa for anxiety. Tr.
260-61. On July 22, 2002, Mr. Wood noted that Ms. Harvey's anxiety
was decreased, and that the Celexa "seems to be controlling
symptoms." Tr. 255. At about that time, she quit smoking.

### Hearing Testimony

    Ms. Harvey testified that the longest time she ever worked at
a job was "a few months," working at a factory making mouse pads.
Tr. 318. However, she only worked fulltime at that job for a month.
Tr. 319. Ms. Harvey thought she could do the factory job making
mouse pads if that job were available to her here, but had "no
idea" whether she could sustain the job eight hours a day, five
days a week. Tr. 331, 334.

    She worked as a server in an adult care center for a day, but
"ended up being a dishwasher in the back" because taking down what
people wanted to eat made her "nervous, very nervous." Tr. 321-22.
Ms. Harvey testified that she worked as a cashier at a gas station
for about three months in 1998, but she had difficulty counting the
money in the till and making change. Tr. 322.

    Ms. Harvey said she received vocational training at Columbia
Gorge Training Center, where she worked for two weeks, five or six
hours a day, sorting papers and snipping threads. Tr. 324.

    Ms. Harvey testified that she reads, but has difficulty
remembering what she has read. Tr. 326-27. She cooks for herself

FINDINGS AND RECOMMENDATION Page 13

and cleans house. Tr. 327. Most of her exercise is walking, but she rarely attends any social activities because she has no one to go out with. Tr. 327. She tries to go to church every Sunday, but she sometimes feels uncomfortable there because she gets "scared to participate in things." Tr. 328.

Ms. Harvey has no checking account, paying her rent and utilities by means of money orders. Tr. 336-37. She purchases her food with food stamps. Tr. 337.

She is currently taking Levoxyl for hypothyroid, Celexa, and Lipitor for high cholesterol. Tr. 332. She testified that the Celexa has helped make her calmer, and that her dosage had recently been increased from 20 mg. to 40 mg. Tr. 332, 334. She is still seeing a therapist, and feels that he is able to calm her. Tr. 332-33.

The ALJ called a vocational expert (VE), Patricia Ayerza. The ALJ asked to consider a person who would perform best in a simple, routine, repetitive work environment with no more than infrequent public contact. Tr. 339. The work should not require mathematical proficiency. Id.

Ms. Ayerza testified that such an individual could return to Ms. Harvey's prior jobs, including factory worker, bus person, and porter. Tr. 339.

The ALJ then asked Ms. Ayerza whether there were other jobs Ms. Harvey could do, and Ms. Ayerza testified that she had the residual functional capacity to work as an agricultural produce sorter, janitor, and laundry worker. Tr. 340-41. Ms. Ayerza

testified that her testimony was consistent with the <u>Dictionary of Occupational Titles.</u> Tr. 341.

On cross examination, Ms. Harvey's attorney asked the VE whether, if Ms. Harvey were unable to do a job that involved time pressure, she would be able to perform the jobs the VE had specified. The VE thought it would "for the most part ... take out ... the local labor, the normal labor market" because jobs without much public contact are, for the most part, "quota kinds of jobs." Tr. 346.

**ALJ's Decision**

The ALJ found that the medical evidence revealed Ms. Harvey had "borderline intellectual functioning vs. mild mental retardation." Tr. 18.[2] He also found that the records revealed an impairment of adjustment disorder, but that the records also revealed this disorder is "controlled with medication and there are no vocationally relevant limitations resulting from this disorder." <u>Id.</u> The ALJ concluded that the adjustment disorder did not exacerbate Ms. Harvey's other impairment. <u>Id.</u>

The ALJ concluded that Ms. Harvey's borderline intellectual functioning did not met the criteria for any listed disorder and that "the records" further revealed that her mental impairment "results in mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning and

---

[2] It appears that the ALJ means Ms. Harvey has borderline intellectual functioning, and not mild mental retardation, but the finding is ambiguous.

FINDINGS AND RECOMMENDATION Page 15

moderate difficulties in maintaining concentration, persistence and pace. Id. The ALJ found that she had not experienced any episodes of decompensation. Id.

With respect to Ms. Harvey's testimony, the ALJ wrote,

Careful consideration has been given to the claimant's testimony and it has been found to be credible to the extent she does have an impairment which does cause some limitations, but not to the extent she is completely disabled.

Tr. 19. The ALJ rejected Dr. Zeedyk's GAF of 45 and full-scale IQ score of 64, on the ground that when Dr. Zeedyk did her evaluation, Ms. Harvey was recently separated from her husband and functioning independently for the first time, and therefore "not able to adequately cope with the psychosocial stressors normally encountered in independent living in light of her borderline intellectual functioning." Tr. 19-20. However, in the ALJ's opinion, once Ms. Harvey had obtained treatment and began to learn appropriate skills, "she quickly began to improve." Tr. 20. Therefore, the ALJ did not accord great weight to Dr. Zeedyk's opinions "when compared the [sic] longevity and totality of the medical records." Id.

The ALJ made a specific finding that Ms. Harvey lacked the residual functional capacity to return to former employment, tr. 20, but also made a specific finding that she could perform her prior work as a factory worker, bus person and housekeeper. Tr. 21. In addition, on the basis of the VE's testimony, the ALJ found that Ms. Harvey could work as a laundry worker, agricultural produce worker and janitor. Tr. 20.

FINDINGS AND RECOMMENDATION Page 16

**Standards**

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed

FINDINGS AND RECOMMENDATION Page 18

impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**Discussion**

1. **Did the ALJ fail to consider Ms. Harvey's impairments in combination and err in finding that her adjustment disorder, hypothyroidism, and migraines did not impose vocationally relevant limitations?**

Ms. Harvey asserts that the ALJ found only that she had the medically determinable severe impairments of "borderline intellectual functioning vs. mild mental retardation," but made no mention of her other diagnosed disorders, including hypothyroidism, depression and migraines. The Commissioner argues that Ms. Harvey did not identify hypothyroidism or migraine headaches as conditions that limited her ability to work, and that the medical evidence establishes that her hypothyroidism is well-controlled by medication. I agree. Although chart notes indicate the presence of

FINDINGS AND RECOMMENDATION Page 19

hypothyroidism and complaints about headaches, there is no indication that Ms. Harvey's hypothyroidism is not controlled by medication, and no indication that the headaches were treated with medication. There is also substantial evidence that Ms. Harvey's depression and anxiety were eventually controlled with Celexa.

However, I agree that the ALJ erred with respect to the diagnoses of adjustment disorder or other personality disorders. Although the ALJ found that Ms. Harvey had an adjustment disorder, he concluded that it was controlled with medication, there were "no vocationally relevant limitations resulting from this disorder," and it did "not exacerbate the claimant's other impairment." Ms. Harvey argues that the ALJ gave no explanation of how he arrived at this conclusion, and that it is not proper for the ALJ to make such unsupported conclusions, especially because under the regulations, he was required to recontact any of Ms. Harvey's treating sources for explanations of how her mental disorders interact, 20 C.F.R. § 416.912, and because he did not request the assistance of a medical expert at the hearing.

I agree with Ms. Harvey that the ALJ's conclusion is unexplained and unsupported by any medical evidence in the record. Indeed, there is evidence in the record from which it can be inferred that Ms. Harvey's adjustment disorder or the personality disorders found by Doctor Etcoff did impose vocationally relevant limitations and did exacerbate her impairment of mild mental retardation. See, e.g., tr. 141 (opinion of psychiatrist Dr. Harris that Ms. Harvey's long-standing personality deficit, augmented by

her learning disability, made her unable to get any job "above the barest of minimal");[3] tr. 128 personality testing given by Dr. Etcoff showing elevated clinical personality scales (dependent, self-defeating, avoidant and passive-aggressive) and indications of two severe personality pathologies (borderline and paranoid); tr. 130 (Dr. Etcoff's conclusion that Ms. Harvey would need services "of some kind" due to the fact that "she will not likely be able to hold down a job and function unassisted in the community"). Moreover, there is no evidence in the record that adjustment disorder or personality disorders can be controlled with antidepressants and anti-anxiety agents such as Celexa. While there is evidence that Celexa was intended to treat the anxiety and was helpful in doing so, the record is silent on whether Celexa was intended to have, or had, any impact on her personality disorder or the adjustment disorder. I agree with Ms. Harvey's assertion that medical expert testimony is needed on this issue, and recommend that the case be remanded for that purpose.

**2. Did the ALJ err by failing to find that Ms. Harvey's condition met Listing 12.05: Mental Retardation?**

Ms. Harvey asserts that the ALJ erred by finding that her condition does not meet the listing for mental retardation, 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12.05(C). That Listing provides, in relevant part:

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

---

[3] This comment may have some implications on the issue of whether Ms. Harvey is totally disabled.

*    *    *

> C. A valid verbal, performance, or
> full scale IQ of 60 through 70 and a
> physical or other mental impairment
> imposing an additional and
> significant work-related limitation
> of function.

Ms. Harvey argues that she meets the listing because Dr. Zeedyk found that she had a full scale IQ of 64,[4] based not only on raw

---

[4] Ms. Harvey takes issue with the ALJ's rejection of Dr. Zeedyk's testing results in favor of those of Dr. Etcoff. I agree with her contention that the ALJ's acceptance of Dr. Etcoff's test results over those of Dr. Zeedyk was inappropriate because 1) Dr. Etcoff used an outmoded version of the Wechsler Adult Intelligence Scale (the WAIS-R was superseded by the WAIS-III in October 1997, before Dr. Etcoff administered the WAIS-R), see The Psychological Corporation, WAIS-III Technical Manual (EDS) (San Antonio, 1997); and 2) Dr. Etcoff used a partial version of the WAIS-R while Dr. Zeedyk administered the entire WAIS-III.

I also agree with Ms. Harvey that the ALJ's explanation for rejecting Dr. Zeedyk's findings was inadequate. The ALJ apparently attributed Ms. Harvey's IQ test results to being unable to cope with psychosocial stressors, finding that she "began to improve" once she obtained treatment, and concluding that Dr. Zeedyk's opinions were not entitled to great weight "when compared [with] the longevity and totality of the medical records." The ALJ's finding that Ms. Harvey's IQ "began to

FINDINGS AND RECOMMENDATION Page 22

scores, but on her extremely low percentile rankings across a variety of subtests and her demonstrated inability to live on her own and make decisions for herself.

The Commissioner counters that Ms. Harvey failed to carry her burden of proving that she met or equaled a Listing 12.05C because the ALJ properly rejected Dr. Zeedyk's finding that she had an IQ in the 60-70 range, and she failed to establish the existence of another severe impairment. With respect to the failure to prove the existence of another severe impairment, the Commissioner points to evidence in the record that Ms. Harvey was able to manage her own funds, complete her activities of daily living, socialize with others, work for short periods of time, and take medication without assistance.

As discussed above, I conclude that the evidence is not fully developed on the question of whether, even accepting Dr. Zeedyk's finding that Ms. Harvey's full scale IQ was 64, her other mental impairment or impairments-- i.e., the adjustment disorder and/or the personality disorders-- imposed a significant work-related

improve" after she obtained mental health treatment is unsupported by any medical evidence. The ALJ's rejection of Dr. Zeedyk's findings on the basis of "the longevity and totality" of unspecified medical records is legally inadequate. See Holohan v. Massinari, 246 F.3d 1195, 1205 (9th Cir. 2001)(general findings such as "the record in general" indicates improvement are insufficient as a matter of law).

FINDINGS AND RECOMMENDATION Page 23

limitation of function. I recommend that this case be remanded for development of the record on this issue.

### 3. Did the ALJ fail to consider equivalence at Step 3?

Ms. Harvey contends that the ALJ failed to explain his finding that her impairments did not, singly or in combination, meet or equal a listing at Step 3; she points out that his only analysis of this issue was the statement, "No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment."

If "medical findings are at least equal in severity and duration to the listed findings," a finding of medical equivalence to a listed impairment is justified. 20 C.F.R. § 416.926. Ms. Harvey argues that this means the symptoms, signs and laboratory findings that pertain to her condition must be compared with the criteria of the listed impairment.

The Commissioner asserts that the ALJ considered the combined effects of all her impairments because his residual functional capacity assessment limited her to simple work and limited public contact.

I agree that the ALJ failed to develop the record by eliciting medical testimony on the question of whether the symptoms of Ms. Harvey's adjustment disorder and/or personality disorders were functionally equivalent to the Listing 12.05(C) requirement of a physical or other mental impairment imposing an additional and significant work-related limitation of function. I disagree with the Commissioner that the mere inclusion of simple work and limited

public contact in the residual functional capacity assessment constitutes a finding of no medical equivalence. I recommend that the case be remanded for additional medical testimony and findings on this issue.

**4.    Was the ALJ's hypothetical to the VE incomplete?**

For the testimony of a VE to be considered reliable, the hypothetical posed to the VE by the ALJ must include all of the claimant's functional limitations, both physical and mental, that are supported by the record. <u>Thomas v. Barnhart</u>, 278 F.3d 947, (9th Cir. 2002). If the hypothetical does not reflect all of a claimant's limitations, the VE's testimony has insufficient evidentiary value to support a finding that the claimant can perform jobs in national economy. <u>Matthews v. Shalala</u>, 10 F.3d 678 (9th Cir. 1993).

Ms. Harvey argues that the ALJ's residual functional capacity analysis was necessarily incomplete because of the ALJ's failure, discussed above, to consider her impairments in combination. She also argues that the ALJ's failure to include in his hypothetical question to the VE specific limitations of fatigue (the result of her unstable hypothyroidism), and  deficiencies of concentration, persistence or pace, as found by Dr. Anderson and Dr. LeBray, deprives the VE's opinions of evidentiary value sufficient to support his finding that Ms. Harvey retained the residual functional capacity to do work existing in the national economy.

A finding that a claimant has "moderate" deficiencies of concentration, persistence or pace represents a "severe" limitation

FINDINGS AND RECOMMENDATION Page 25

under Social Security regulations. 20 C.F.R. § 404.1520a(d)(1). Deficiencies of concentration, persistence or pace are not adequately represented in a hypothetical that merely limits the claimant to simple jobs, as the ALJ did in this case. Thomas, 278 F.3d at 956 (citing Newton v. Chater, 92 F.3d 688, 695 (8th Cir. 1996).

Ms. Harvey challenges the ALJ's step five determination on another ground, which is that he improperly disregarded testimony elicited from the VE by her counsel that she was unemployable in a competitive labor market because of evidence in the vocational assessment that she needed a job coach and was unable to do a job that involved time pressure. The evidence that Ms. Harvey needed a job coach is, as the Commissioner points out, equivocal; Ms. Gettman merely opined that Ms. Harvey "would benefit from having consistent follow-up with an advocate who could help her problem solve any issues ... related to her learning the job." However, there was substantial evidence in the record that Ms. Harvey was limited to jobs that did not impose time pressure, and the VE acknowledged that because Ms. Harvey was limited from public contact, the jobs available to her were "quota kinds of jobs." I agree that the ALJ's failure to consider this evidence further weakens the step five analysis.

I conclude that the VE's testimony was insufficient to support the ALJ's step five finding, and recommend that the case be remanded for a more complete and accurate hypothetical to the VE.

**5.    Remand**

Ms. Harvey asserts that the Commissioner's decision should be reversed and that she should be found disabled as alleged. Alternatively, she urges the court to consider a remand for further proceedings, with instructions.

The decision whether to remand for further proceedings turns upon the likely utility of such proceedings, and is a matter of judicial discretion. Harman v. Apfel, 211 F.3d 1172, 1177, 1179 (9th Cir. 2000). In Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996), the court held that improperly rejected evidence should be credited and an immediate award of benefits be made when: 1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

I am not persuaded that the Smolen test is satisfied. The outstanding issues to be resolved before a determination of disability can be made in this case are 1) whether Ms. Harvey's adjustment disorder and/or personality disorders constitute severe impairments; 2) if not, whether they satisfy, or are functionally equivalent to, another severe impairment, which would satisfy the requirements of Listing 12.05(C) and 3) whether Ms. Harvey's low IQ and other impairments preclude her from engaging in work that exists in the national economy.[5]

---

[5] The ALJ's finding that Ms. Harvey could return to her past relevant work is, as discussed, contradicted by his finding that

FINDINGS AND RECOMMENDATION Page 27

I recommend that this case be reversed and remanded for further proceedings.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due November 2, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due November 16, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this <u>18th</u> day of <u>October</u>, 2005.

<u>/s/ Dennis James Hubel</u>

Dennis James Hubel
United States Magistrate Judge

she had not engaged in substantial gainful activity since her alleged onset date and by the uncontradicted evidence in the record that none of Ms. Harvey's various jobs constituted substantial gainful activity because her earnings were insufficient and she did not remain in the jobs long enough.

FINDINGS AND RECOMMENDATION Page 28